IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ART LONGORIA,

          **Plaintiff,**

v.                                **No. 1:10-CV-0794 JCH/WDS**

SANDIA NATIONAL LABORATORIES
and METAL TRADES COUNCIL,

          **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Sandia Corporation's Motion for Summary Judgment [Doc. 66] and Defendant MTC's Motion for Summary Judgment [Doc. 73]. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants both Motions.

## I.    BACKGROUND

Plaintiff Art Longoria was terminated from employment by Defendant Sandia National Laboratories (Sandia). Plaintiff filed this "hybrid action" under Section 301 of the Labor Management Relations Act (codified at 29 U.S.C. § 185) ("LMRA") against Defendant Sandia for breach of the Collective Bargaining Agreement ("CBA") and against the union to which Plaintiff belonged, Defendant Metal Trade Council ("MTC" or "the union"), for breach of its duty to fairly represent Plaintiff. Defendants have each filed motions for summary judgment in this case, and this Court grants summary judgment in favor of each Defendant.

Unless otherwise noted, the following facts are undisputed. Plaintiff was employed by Sandia from May, 2006, until he was terminated in December, 2009. [Doc 67, ¶ 4; Doc. 1 ¶ 18, Doc 5. ¶ 18]. On November 23, 2009, Plaintiff was ordered to take a random drug test, the results of

which indicated that he had marijuana metabolites in his system.  [Doc. 67 ¶¶ 5-6; Doc. 67-1 p. 39].

The positive result was confirmed through a "split sample" test performed by a separate laboratory.

[Doc. 67 ¶ 7].  Plaintiff was not informed of the positive drug test result until November 30, 2009,

at which point he submitted another urine specimen, the results of which were negative for the

presence of marijuana or marijuana metabolites.  [Doc. 72, p. 3 ¶ 7; see also Doc. 7, p. 2 first ¶ 3;

Doc. 67, ¶ 11].

Plaintiff belonged to the MTC.  [Doc. 67-1, ¶ 4].  At the time of the termination, MTC and

Sandia were parties to a CBA, which included a "Side Agreement" that MTC members were subject

to Sandia's drug programs and testing.  [Doc. 67 ¶¶ 1, 2].  The "Side Agreement" is reflected in a

Letter from Margaret Harvey, Manager of Employee and Labor Relations for Defendant Sandia, to

Bacillio Sena (referred to as Bill Sena in the record), President of MTC.  [Doc. 67-1 p. 7].  The

letter, signed by both Mr. Sena and Ms. Harvey, states: "The Metal Trades Council agrees to

recognize 10 CFR Part 707, *Workplace Substance Abuse Programs at DOE Sites*, with the provision

that, for Council-represented employees, the programs and testing for substance abuse becomes

effective on October 1, 2009." [Doc. 67-1 p. 7].

Pursuant to 10 C.F.R. § 707.5(a), covered contractors to the federal government must

"develop a written program consistent with the requirements of this part and the guidelines of the

Department of Health and Human Services and subsequent amendments to those guidelines."

Sandia's Workplace Substance Abuse Prevention and Testing Policy (Drug Policy) states:

> The immediate consequences of a confirmed, positive drug test include the worker's badge
> being confiscated, clearance inactivated and the person being removed from his or her TDP
> [Testing Designated Position] duties.  Other disciplinary actions would follow; they can
> include termination.  Failure to report to an approved collection center the day of being
> verbally notified, or refusal to provide a specimen, will result in measures equal to those for
> a positive drug test.

2

[Doc. 67-1 p. 9].

The parties do not dispute that this policy does not require an employee to be terminated for failing a drug test or for failing to report for a drug test.  [Doc. 67, ¶ 3; 72 p. 2 ¶ 1].  Though the Drug Policy states that failing to report to a drug test "will result in measures equal to those for a positive drug test," Plaintiff submits that he has personal knowledge of two employees who failed to show up for drug tests and were not disciplined.  [Doc. 72 p. 2 ¶ 2].  Defendant Sandia's Labor and Employee Relations Specialist, Victor Lovato, also testified that he knew of three individuals who failed to report to drug tests who were not terminated.  [Doc. 72, p. 2 ¶ 3 and p. 3 ¶ 4].

Plaintiff challenges the validity of the first drug test.  Plaintiff testified that, about a week before his drug test, he and his wife went to a night club in Las Vegas and left the club because of the odor of marijuana.  [Doc. 72, p. 3 ¶ 6].  However, Defendant has submitted a declaration by a physician specializing in Medical Toxicology, who is also a board-certified Medical Review Officer, that "[p]ossible exposure to marijuana smoke originating from others is not a scientifically valid explanation for the positive test results.  The scientific evidence demonstrates more likely than not that [Plaintiff] used marijuana some time on or before November 23, 2009."  [Doc. 67-1 p. 41-42, ¶¶ 1, 8].  Plaintiff does not directly dispute this evidence, but points out that the medical-review officer who conducted Plaintiff's verification interview testified as follows:

> Q:   Do you know whether it's possible, just hypothetically – you know, here we are sitting around the table, and we're all smoking marijuana, except you, and is it possible for you to ingest or breathe in that marijuana smoke and for it to show up in a test later on?
> A:   I would say I can't answer that with my expertise.

[Doc. 72, ¶ 9; Doc. 72-6 p. 3, depo p. 21:2-9].  In addition, regarding the collection of the urine sample, Plaintiff's deposition contains the following exchange:

> Q.   I understand your claim is that the November 23rd drug test results are

3

|     | wrong and that you say that because you did not do illegal drugs. |
| --- | --- |
| A.  | Correct.  Straightforward. |
| Q.  | Is there any other basis that you have to say that the November 23rd drug test is wrong? |
| A.  | Other than – no, because there is no proof in that, but other than believing that their chain of control was not there. |
| Q.  | What is it about their chain of custody that you think was wrong? |
| A.  | Their chain of custody – just how first it was presented, for one; getting sent down there by the wrong personnel, for two.  The nurse stands there and leaves the room.  It used to be an open specimen, where you'd have an open cup and you'd go into the room and then you'd come back out and then they'd close the cup and all this stuff. . . .  I don't believe it was accurate, because there were open sample bottles all over the table and stuff like that. |

[Doc 72-1, p. 15, (depo. p. 153:25 to 154:25)].  Plaintiff argues that these actions violate 49 C.F.R. § 40, "Procedures for Transportation Workplace Drug and Alcohol Testing Programs."[1] [Doc. 72, pp. 9-12].

Defendant MTC filed grievances of Plaintiff's termination and of his suspension without pay between the drug test and the termination.  [Doc. 67-1, p. 28, 29].  Plaintiff met with MTC's president, Bill Sena, on November 30, 2009, the day he learned of the positive drug test.  [Doc. 72, ¶ 12].  Mr. Sena told Plaintiff that day that "he's seen this kind of stuff before, that we need to file these papers and stuff and file for a grievance right away, and we believed that it was a wrongful termination, and . . . we're going to fight this to the end and beat them."  [Doc. 72-1, p. 7 (Depo. p. 85:6-16)].  However, MTC did not file the grievances with Defendant Sandia until January 22, 2010. [Doc. 67-1 pp. 28, 29; Doc. 72 p.¶ 14].  The written grievance procedure consists of Steps 1, 2, and 3.  [*Id.*]  The CBA states that "[g]rievances of discipline shall be presented within ten (10) working

---

[1] While the Side Agreement cites DOE regulations, Plaintiff relies solely on Department of Transportation ("DOT") Regulations, and Defendants do not argue that Plaintiff is relying on the wrong regulations.  Defendant Sandia's Drug Policy cites both DOE and DOT regulations. [Doc. 67-1, p. 9].  The Court is able to decide the motions for summary judgment without deciding precisely which regulations are applicable in this case.

days of the date of notification of the Council." [Doc. 67-1 p. 14, ¶ 3.1]. For Step-2 grievances, the deadline is three full workdays from the time Sandia orally replies to the Step-1 grievance. [*Id.* ¶ 4.2]. "Grievances referred to Step 3 shall be submitted in writing by the Council's Bargaining Agent to Employee and Labor Relations within five (5) workdays from the time of the written reply at Step 2." [Doc 67-1 p. 14 ¶ 4.3]. Finally, a referral for arbitration must be made within six months from the date of the Step-3 grievance answer. [*Id.*, p. 15, ¶ 11:1]. Plaintiff argues that the grievance was not filed timely. [Doc. 72 ¶ 18]. Defendants counter that the untimeliness of the grievances is immaterial because Sandia did not contest the timeliness of the grievance. [Doc. 67, ¶ 15].

On December 14, 2009, Mr. Sena sent an "Official Request for Information" to Victor Lovato requesting "Copies of all documentation relied upon to determine the firing of Art Longoria." [Doc. 72-8]. These documents, including documentation pertaining to the drug testing, were not provided to the union prior to the grievance meeting. [Doc. 72-1, p. 9 (Depo p. 111:10-19)].

MTC notified Plaintiff that the grievance meeting would be on January 28, 2010, but no one other than Plaintiff and a union representative appeared for the meeting. [Doc. 72 ¶¶ 16-17]. While walking in to the meeting, the union representative received a phone call and told Plaintiff that the meeting was cancelled and Defendant's Medical Review Officer (MRO), Dr. Sauerman, could not show up to the meeting. [Doc. 72-1 p. 10 (Depo p. 114:12 to 115:18)]. The Step-3 grievance hearing was finally held on April 1, 2010. [Doc. 72 ¶ 20]. Plaintiff testified that the meeting opened with animosity because MTC had not received any of the documentation it had requested. [Doc. 72-1, p. 11 (depo. p. 120:11-14)]. Plaintiff further testified that, from that moment on, the meeting "became a farce, because we had nothing to back us up, other that Mr. Sena saying, you know, 'We believe it was a wrongful termination due to this, due to this, due to this.'" [Doc. 72-1, p. 11 (Depo.

p. 120:15-19)].  Plaintiff further testified:

> A.    Mr. Sena started arguing a lot with Dr. Sauerman, with Victor Lovato. Victor Lovato, to put it mildly, is like a childhood – a kid trying to – being handled in a grievance hearing, and so it just became a farce of them arguing back and forth.  Honestly, my grievance hearing was like thrown out the window right then, right there.
>
> Q.    Why did you think that your grievance hearing was thrown out the window?
>
> A.    Honestly, the – by the time we had that grievance hearing, I think it was out of people's minds, and I think the importance of it was gone.  The lack of documentation, trying to see where we were going with it was – it just became just like a playground out there.
>
> Q.    Did you think that the people at the meeting were behaving unprofessionally?
>
> A.    Yes, sir.
>
> Q.    Who was behaving unprofessionally?
>
> A.    Victor Lovato.
>
> Q.    Anyone else?
>
> A.    Bill Sena was to the respect – to the respect that he was – I guess you could say he was trying to stick up for me and stuff, but it just became an argument between the two; loud, obnoxious, loud.
>
> Q.    It didn't seem like it was a productive discussion?
>
> A.    No.

[Doc. 72-1, p. 12 (Depo. p. 121:4 to 122:6)].  Plaintiff also testified that at the Step-3 grievance meeting his union steward "tried bringing up information and stuff, you know, based upon what we were looking for, policy and procedures, stuff like that, and they would just shut him off.  They wouldn't even let [the steward] speak." [Doc. 72-1 p. 12, (depo p. 124:10-16)].  By "they," Plaintiff testified he meant "[m]ainly Victor Lovato." [*Id.*].

Plaintiff also testified that during the grievance hearing Dr. Sauerman was present and was asked why Plaintiff had not received the medical documentation.  [Doc. 72-1 p. 11-12, Depo. p. 120:25 to 121:13].  Dr. Sauerman stated that he would not give MTC the documentation, but if Plaintiff requested the forms directly he would give them to Plaintiff.  [Doc. 72-1 p. 11-12, Depo. p. 123:19-25].  Plaintiff testified that, within a week or two of the meeting, the doctor did provide the test results to Plaintiff.  [*Id.*].

Plaintiff testified that immediately after the hearing, Mr. Sena told Plaintiff: "that's as far as they would go, that Sandia National Laboratories would respond better to legal action." [Doc. 72-1 p. 13 (Depo. p. 126: 24 to 127:21)]. Plaintiff understood this to mean that MTC was not going to request arbitration. [*Id.*]. Plaintiff filed this lawsuit on August 24, 2010, almost five months after the grievance meeting. [Doc. 1]. Thereafter, MTC timely requested arbitration on September 27, 2010. [Doc. 72-10]. Plaintiff testified that he did not hear from MTC between the Step-3 grievance meeting and the time he filed the lawsuit. [Doc. 72-1, p. 13 (Depo. p. 126:11 to 128:7)].

The arbitration was never held. In October 2011, MTC withdrew its arbitration request and offered to assign to Plaintiff the "arbitration rights" for Plaintiff to pursue at his own expense. [Doc. 78-2 p. 3-4]. MTC indicated to Plaintiff that, in deciding to withdraw the arbitration request, the union considered "the information we learned through the grievance process, as well as the information learned through the court's discovery process in the lawsuit you brought against Sandia Labs and MTC. We also considered the information your attorney submitted to MTC on your behalf in a letter dated September 12, 2011 as well as the legal opinion of our own legal counsel." [*Id.*]. Defendant MTC also explained the "factors" considered in deciding to withdraw the arbitration request:

> First, we reviewed the merits of your grievances. It is our belief that in arbitration Sandia Labs has a good chance of establishing the Seven Tests of Just Cause for your termination. In addition, regarding the merits of Grievance No. 3671, we believe that your unpaid leave of absence would likely be found to be covered by Sandia Labs policy, and Sandia Labs has stated that if you had not requested the split sample test it would have terminated you immediately. Second, we believe the outcome of your arbitration would likely have little impact on other bargaining unit members because so far few Sandians have ever tested positive on a drug test. Third, we have a fiduciary duty to take all reasonable measures to protect MTC's financial resources and make wise decisions in expending those resources, and we do not believe that paying for an arbitration of your grievances would be a good use of those resources. Fourth, we have considered the impact of the termination on you personally. While you have alleged an estimated loss in pay and benefits of around $100,000, you also

7

were at least able to obtain gainful employment soon after your termination.

[*Id.*].   Plaintiff declined to accept the assignment of his arbitration rights.  [Doc. 74-1, p. 1].

As to Sandia, Plaintiff's Complaint alleged it violated the LMRA because it "wrongfully terminated [Plaintiff] in circumstances where [Sandia's] breaches and violations of the CBA, DOT regulatory requirements, and policies and procedures were egregious and without reason." [Doc. 1, ¶ 33].  Plaintiff alleged that Sandia "refused to abide by its drug testing procedures, applied the procedures in a disparate manner to harm [Plaintiff], refused to provide requested medical information, and breached and repudiated the contractual remedies available to [Plaintiff] through the CBA."  [*Id.*].  As to MTC, Plaintiff alleged it violated the LMRA by "failing to appropriately provide [Plaintiff] representation on his grievances and processing [Plaintiff's] grievances in a perfunctory manner;" "act[ing] in a dishonest, arbitrary, discriminatory, and perfunctory manner, thereby contributing to the termination of [Plaintiff];" "ignor[ing] the merits of [Plaintiff's] grievances and act[ing] in bad faith in deceitfully and dishonestly leading [Plaintiff] to believe that he was receiving timely, adequate representation on the grievances;" and "dropp[ing] [Plaintiff's] grievances related to his termination, although the union stated repeatedly to [Plaintiff] that the CBA, DOT regulations and [Sandia's] policies and procedures had been violated by [Sandia]." [Doc. 1 ¶¶ 37-40].[2]

Defendants have both filed motions for summary judgment.  Sandia argues that Plaintiff has not established a genuine issue of material fact that MTC breached its duty of fair representation or that Sandia breached the CBA.  [Doc. 67, p. 2].  MTC's motion for summary judgment adopts in

---

[2] Plaintiff also brought causes of action for *prima facie* tort and breach of an implied contract of employment against Defendant Sandia.  He has voluntarily dismissed those claims, as well as his claims for damages related to emotional distress.  [Docs. 43, 82].

full Sandia's motion for summary judgment, and adds only an argument that MTC could not have breached its duty of fair representation because it offered to assign to Plaintiff his arbitration rights at the time it notified Plaintiff that it would not take his claim to arbitration.  [Doc. 74 p. 1].

Plaintiff opposes summary judgment.  Plaintiff presented evidence of employees who were not terminated for violating Defendant Sandia's Drug Policy by failing to report to a drug test, [Doc. 72 pp. 2-3, ¶¶ 2-4], and argues that he has established genuine issues of material fact sufficient to establish a breach of the CBA by submitting evidence that Defendant Sandia breached various regulations within 49 C.F.R. § 40, the DOT's "Procedures for Transportation Workplace Drug and Alcohol Testing Programs." [Doc. 72 pp. 9-12].  Plaintiff argues that, in violation of 49 C.F.R. § 40: the test procedures was not in accordance with the regulations; the MRO did not have the requisite knowledge with respect to alternative explanations for positive test results; the MRO did not know whether second-hand marijuana smoke could result in a positive test result; the MRO did not have adequate continuing education requirements; and the MRO did not timely notify Plaintiff of the positive test results.  [*Id.* p. 9-10].  Plaintiff argues that these errors are grave and serious and compromised the integrity of the testing process, and, therefore "raise issues of fact on the question of whether [Defendant Sandia] had true cause to terminate the employment of [Plaintiff] on the basis of a positive drug test."  [*Id.* p. 11-12].

As to MTC, Plaintiff argues that the union breached its duty of fair representation by:  failing to timely and appropriately file Plaintiff's grievances; misrepresenting and misstating to Plaintiff that the grievances had been filed; unilaterally cancelling the January 28, 2010 Step-3 grievance meeting without notice to Plaintiff; failing to collect, investigate, and review the required documentation related to Plaintiff's drug testing; failing to gather and/or delaying in gathering the necessary medical and drug testing documentation in order to fairly and adequately represent

9

Plaintiff at the April 1, 2010 Step-3 grievance meeting; arguing at the Step-3 grievance meeting without presenting the merits of Plaintiff's grievance; failing to advise Plaintiff of the decision on the grievance shortly after the grievance meeting; telling Plaintiff that it was abandoning the grievance after the Step-3 grievance meeting; providing no further representation for Plaintiff and failing to contact Plaintiff between the Step-3 grievance meeting and the date Plaintiff filed this lawsuit; failing to advise Plaintiff of, or consult with Plaintiff regarding, an arbitration request on September 27, 2010; and going back "on its promise" to arbitrate Plaintiff's grievance. [Doc. 72 pp. 8-9].

**II.   ANALYSIS**

   **A.  Summary Judgment**

   Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted). "The burden is on the moving party to show the absence of a genuine issue of material fact. Pleadings and other evidence must be viewed in the light most favorable to the party opposing summary judgment." *Conaway v. Smith*, 853 F.2d 789, 792 n.4 (10th Cir. 1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). The party opposing summary judgment "must present sufficient evidence in specific,

10

factual form for a jury to return a verdict in that party's favor."  *Munoz v. St. Mary-Corwin Hosp.*,
221 F.3d 1160, 1164 (10th Cir. 2000) (citations and internal quotation marks omitted).  "Rule 56(c)
mandates the entry of summary judgment, after adequate time for discovery and upon motion,
against a party who fails to make a showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex
Corp.*, 477 U.S. at 322.

### B.  The Elements of a Hybrid Action

Plaintiff has brought a "hybrid" Section 301/breach of the duty to fairly represent case, so
called "because it combines two conceptually independent causes of action, the first against the
company for breach of the contract (a standard § 301 claim) and the second against the union for
breach of the duty of fair representation (a claim implied by operation of a union's status under
federal law as the sole bargaining representative of the employee)."  *Webb v. ABF Freight Sys., Inc.*,
155 F.3d 1230, 1238 (10th Cir. 1998).

> To prevail against his former employer under this hybrid § 301/DFR cause of action,
> a discharged worker must prove three elements: (1) Some conduct by the worker's
> union that breached the duty of fair representation; (2) A causal connection showing
> that the union's breach affected the integrity of the arbitration process, and; (3) A
> violation of the collective bargaining agreement by the company.

*Id.* at 1239.  The plaintiff can bring suit against either the union or the employer, or both, *see id.*,
"but the case he must prove is the same whether he sues one, the other, or both[,]" because the
claims are "inextricably interdependent."  *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-
65 (1983) (internal quotation marks and citations omitted); *see also Hines v. Anchor Motor Freight,
Inc.*, 424 U.S. 554, 562-64 (1976) (explaining the policy reasons behind "defer[ring] to the tribunal
chosen by the parties finally to settle their disputes").

### C.  Elements 1 and 2: The Duty of Fair Representation and the Causal Connection

A union, as the exclusive bargaining representative of its members, has a statutory duty to fairly represent all of its members in enforcement of their respective collective-bargaining agreements. *See Vaca v. Sipes*, 386 U.S. 171, 177 (1967). "Necessarily a wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents." *Hines*, 424 U.S. at 563-64 (internal quotation marks, citation and alterations omitted). A union breaches its duty of fair representation when it acts in "a discriminatory, dishonest, arbitrary, or perfunctory fashion." *DelCostello*, 462 U.S. at 164; *see also Webb*, 155 F.3d at 1238 (same).[3] But the Supreme Court has expressed that "[t]hough we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." *Vaca*, 386 U.S. at 191. Thus, "even if the employee's claim were meritorious, his union might, without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigorously in arbitration." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 742 (1981). Additionally, even if an employee establishes that the union breached its duty of fair representation, the employee will not be successful unless "there is substantial reason to believe that a union breach of duty contributed to the erroneous outcome of the contractual proceedings." *Webb*, 155 F.3d at 1239 (internal quotation marks and citation omitted). A union does not violate "its duty of fair

---

[3] More recent Supreme-Court cases have only referred to the tripartite discriminatory, dishonest, or arbitrary test for a breach of the duty of fair representation, and thus there is some question as to whether the "perfunctory" processing of a grievance is a separate element or merely an example of arbitrary conduct in representing a union member. *See Robertson v. Burlington N. & Santa Fe Ry. Co.*, 216 Fed. App'x 724, 728 n.2 (10th Cir. 2007). However, this question does not affect the analysis of the case before this Court, and the Tenth Circuit has not revisited *Webb*. *See id.* Therefore, this Court continues to apply the standard set forth in *Webb*.

representation by mere negligent conduct; carelessness or honest mistakes are not sufficient to impose liability on a union." *Id.* at 1240.

Plaintiff relies heavily on *Webb*, in which the terminated truck driver alleged that charges against him were "trumped up" and the real reason for his termination was retaliation for union activities. *Webb*, 155 F.3d 1234. The Court of Appeals upheld a jury verdict in favor of the employee. *Id.* At trial, the employee submitted evidence of the union's failures in investigating the charges and in its representation of the employee during the grievance process. *Id.* at 1236. The evidence included: the union representative assigned to represent the employee was from a different municipality which represented employees with interests adverse to those of the employee's municipality; the employee requested the representative to obtain certain documents, which the representative agreed to do but failed to request; the representative was made aware of potentially helpful witnesses but did not call any witnesses at the hearing; the representative failed to object to evidence which was, according to the employee, exaggerated; the representative failed to review the evidence prepared by the employer prior to the first grievance hearing and as a result was surprised by some of the evidence; and, though aware of the employee's claim of retaliation, the representative failed to introduce any evidence of retaliation. *Id.* at 1236-37. The first grievance-hearing committee deadlocked, and, therefore, the grievance was transferred to a different area to be heard. *Id.* The representative told the employee that he did not need to be present for the second hearing because no new testimony or evidence would be introduced, however, at the second hearing, new photographs were introduced and the representative told the hearing panel that the employee was invited to attend and he did not know why the employee was not present to testify. *Id.* at 1237. Also at the second hearing, the union representative stipulated to the evidence the employee claimed was exaggerated, and stated to the panel that he did not know what position the employee would

13

take on certain issues or why he took certain actions.  *Id.*

The *Webb* Court concluded that the actions of the union supported a finding of perfunctory and bad-faith representation, which was the first element of a hybrid action.  *Id.* at 1240-41 and 1241 & n.14.  The Court further rejected the union's argument that it had no duty to conduct its own investigation and instead held that the "amount of investigation required of a union to meet its duty of fair representation depends on the circumstances of each case."  *Id.* at 1241.  The Court determined that a reasonable juror could have concluded that the union failed to make any serious effort to investigate the employee's claims.  *Id.*  As to the second element, the causal connection, the Court concluded that there was sufficient evidence to support the conclusion that the union's breaches of its duty of fair representation, particularly misleading the grievance panel as to certain evidence, "seriously undermined" the grievance proceedings.  *Id.* at 1242-43.  The Court stated that the representative's "concessions allow a reasonable inference that Local 17 deliberately attempted to submarine [the employee's] case by sending the [grievance] panel a message that Local 17 had no faith in [the employee's] claims and was merely going through the motions on his behalf."  *Id.* at 1243.  Finally, as to the third element of a hybrid action, whether the employer breached the contract, the Court concluded that there was sufficient evidence to support the jury verdict.  *Id.* at 1244.  The employee presented extensive "law-of-the-shop" testimony from co-workers that other employees were not terminated for similar conduct and evidence that the employer exaggerated the employee's conduct to fit it into an offense terminable under the contract.  *Id.* at 1244-45.  Further, the Court concluded that the employee presented evidence from which a reasonable juror could conclude that the employee was in fact terminated in retaliation for union activity.  *Id.* at 1244-45.  Thus, the Court affirmed the jury verdict in favor of the employee.  *Id.* at 1249.

While the facts of this case do bring *Webb*'s rule and analysis generally into play, *Webb* must

14

be read in conjunction with additional precedent, and particularly on point is the Supreme-Court case of *Vaca*. In *Vaca*, after examination by the company doctor, the employee was discharged as medically unfit for duty, despite providing concurrent third-party medical evidence that he was fit for duty. *Vaca*, 386 U.S. at 174-75. The union processed the grievance through all steps prior to arbitration. *Id.* at 175. However, prior to arbitration, in an attempt to obtain medical evidence meeting the standard the employer was requiring, the union paid for another medical evaluation of the employee, which showed the employee was in fact not fit to work. *Id.* The employer offered a settlement of referral to a rehabilitation center, which the employee rejected. *Id.* Based on the medical evaluation, the union declined to take the matter to arbitration, determining that it did not have sufficient medical evidence to be successful at the arbitration. *Id.* at 175-76.

The employee sued the union and a jury found in favor of the employee, but the *Vaca* Court overturned the jury verdict, concluding as a matter of law that the evidence did not establish that the union acted in bad faith by declining to pursue arbitration. *Id.* at 173. The Court relied on the union's actions in processing the complaint through the third step, obtaining an independent medical evaluation, and attempting to negotiate a settlement when the medical evaluation proved unhelpful as evidence that the union acted in good faith. *Id.* at 194. Moreover, the Court determined that under the collective-bargaining agreement, there was no absolute right to arbitration, and thus the union met its obligation of fairly representing the employee. *Id.* at 194-95. The Court determined that "a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." *Id.* at 192. The Court further rejected a standard finding a breach of the union's duty solely based on sufficient evidence of a breach of the collective-bargaining agreement by the employer to support a verdict. *Id.* at 192-93.

*Webb* establishes that, if an employee can produce evidence of significant failures by the union to investigate an employee's claim, or significant failures in the representation of an employee in the grievance process which "seriously undermine" the integrity of the grievance process or contribute to an erroneous outcome, the employee can meet his or her burden to survive summary judgment on the first two elements of a hybrid action.  On the other hand, *Vaca* makes it clear that, even if an employee has a potentially meritorious grievance, the union does not have to pursue it to arbitration, as long as its reasons for not pursuing arbitration are not arbitrary, discriminatory, made in bad faith, or perfunctory.  Viewing the evidence of this case in the light most favorable to Plaintiff, this Court concludes that Plaintiff has presented enough evidence to establish a genuine issue of material fact that Defendant MTC breached its duty to fairly represent him, as discussed below.  However, to be successful in his hybrid action, Plaintiff must **also** establish a genuine issue of material fact that these failures seriously undermined the outcome of the grievance process and that Sandia breached the CBA.  As discussed below, Plaintiff has not met his burden in either of these two elements.

Plaintiff's argument as to the duty to fairly represent is based on several alleged failures. This Court agrees with Plaintiff that the purported failure to timely file Plaintiff's grievance and misrepresenting and misstating to plaintiff that his grievance had been filed creates a genuine issue of material fact as to whether MTC breached its duty of fair representation.  *See Foust v. Int'l Bhd. of Elec. Workers,* 572 F.2d 710, 715-16 (1978) (affirming the verdict in favor of the employer against the union where "[t]he Union filed the grievance out of time and it was due to this that the Board denied it"), *rev'd on other grounds,* 442 U.S. 42 (1979).  Similarly, MTC's failure to notify Plaintiff of the decision on his grievance in a timely fashion was also a failing that creates a genuine issue of material fact as to whether Defendant breached its duty to fairly represent Plaintiff.  Because

16

time limits are involved, it was particularly important for Plaintiff to be apprised of the date of the decision on his grievance.  However, unlike in *Foust*, here the employer heard the grievance on its merits despite its purported untimeliness.  *Compare id.*  Additionally, MTC's action of timely filing the arbitration request prevents Plaintiff from establishing a genuine issue of material fact that MTC's delay in filing the grievance affected the grievance process.  As such, Plaintiff has not presented evidence that these alleged failures "seriously undermined" the outcome of his grievance process.  *Webb*, 155 F.3d at 1242.

Also, MTC's failure to collect, or instruct Plaintiff to collect, the results of the medical tests and the relevant policies is akin to the failures to investigate in *Webb,* and thus is sufficient to establish a genuine issue of material fact of a breach of the duty of fair representation.  *See Webb*, 155 F.3d at 1241.  While the evidence suggests that the doctor would not release the medical information to MTC, viewing the evidence in the light most favorable to Plaintiff, had Plaintiff been apprised of this circumstance by MTC prior to the grievance hearing, he could have taken additional steps to obtain the documents, which he in fact did after the hearing.  [Doc. 72-1 p. 12, (Depo. p. 123:19-25)].  Also, MTC's action of telling Plaintiff that it would not pursue Plaintiff's grievance any further, though it knew that its investigation had not been (but could soon be) completed, raises a genuine issue of material fact as to whether MTC violated its duty to fairly represent Plaintiff.  However, again, there is no evidence showing that this failure seriously undermined the grievance process or contributed to an erroneous outcome.  Rather, MTC ultimately did timely file for arbitration, and then obtained, through the discovery process in this case, all of the information for a full investigation of Plaintiff's case.  [Doc. 67, ¶¶ 21-22].  MTC analyzed that information and the merits of Plaintiff's grievance in ultimately determining that it did not have sufficient evidence to be successful at arbitration.  [Doc. 78-2, p. 3-4].  Thus, Plaintiff has not established a genuine issue

of material fact these failures by MTC seriously undermined the outcome of the grievance process.

As to Plaintiff's remaining claims of a breach of the duty to fairly represent him, this Court concludes that Plaintiff has not established a genuine issue of material fact of a breach of the duty. The first such claim is that MTC unilaterally cancelled the January 28, 2010, grievance meeting. [Doc. 72, p. 8]. The only evidence provided by the record is that this meeting was cancelled because Dr. Sauerman, the MRO, was not available. [Doc. 72-1 p. 10 (depo. p. 115:2-23)]. Thus, the evidence does not indicate that MTC unilaterally cancelled the meeting, as Plaintiff suggests. Plaintiff's next arguments are that MTC unprofessionally argued at the Step-3 grievance meeting, instead of presenting the merits of his claim, and failed to consult with him before filing the arbitration request. [Doc. 72, p. 8]. However, at most, these arguments establish MTC's potential negligence, which is not sufficient to support a claim for breach of the union's duty of fair representation. *See United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372-73 (1990); *Nelson v. Holmes Freight Lines, Inc.*, 37 F.3d 591, 594 (10th Cir. 1994).

> A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.

*Nelson*, 37 F.3d at 594 (internal quotation marks and citations omitted). Plaintiff must establish more that "mere errors in judgment." *Young v. UAW-Labor Emp't & Training Corp.*, 95 F.3d 992, 997 (10th Cir. 1996). "The grievance processes cannot be expected to be error-free." *Hines*, 424 U.S. at 571. Consequently, even assuming Plaintiff has established errors, these errors do not rise to the level of arbitrary, bad faith, discriminatory, or perfunctory representation as a matter of law.

Finally, Plaintiff argues that MTC violated its duty of fair representation by failing to take Plaintiff's case to arbitration. However, under *Vaca*, the refusal to take even a potentially meritorious grievance to arbitration is not a breach of the duty of fair representation unless the

union's reason for doing so is arbitrary, in bad faith, discriminatory, or perfunctory. *See Vaca*, 386 U.S. at 193-95.  This Court found only one Tenth-Circuit case, not cited by the parties, concluding that evidence was sufficient to support a jury verdict that the union's decision not to pursue arbitration was arbitrary and perfunctory.  In *Lampkin v. Int'l Union, UAW*, 154 F.3d 1136 (10th Cir. 1998), the employee was terminated for absenteeism.  *Id.* at 1143.  The union failed to present the employee's version of the evidence in the pre-arbitration grievance meetings.  *Id.* at 1145.  The union then left the employee's case on a "pre-arbitration list" for some months before the grievance request was withdrawn.  *Id.* at 1144.  While the record reflected that the union discussed all grievances on the pre-arbitration list, "[n]othing was said about the content of any discussions of Lampkin's grievance in these meetings."  *Id.*  The union's witness testified that "from a review of Lampkin's folder 'we just didn't feel like we could pursue it to arbitration and win it,'" and "'you also have got a responsibility to look at the union's finances and think and decide if you can afford all of these things. . . . With the record and past history that I have had in other plants, we just can't win an absenteeism.'"  *Id.* at 1144-45.  The Court concluded that the evidence supported the jury verdict for the employee because the union had never presented the employee's argument that the company's own documents did not support its position and the jury could have inferred "the union put its finances ahead of the vigorous presentation of Lampkin's case in carrying out its duty of fair representation."  *Id.* at 1145.

Here, unlike in *Lampkin*, Plaintiff has failed to produce evidence that MTC's decision not to arbitrate his grievance was made in bad faith, arbitrarily, or was discriminatory or perfunctory. Instead, the evidence of record establishes that MTC, after significant discovery, refused to arbitrate the case for several reasons, including the weakness of the merits of Plaintiff's grievance and the minimal impact Plaintiff's grievance had on the rest of the bargaining unit.  [Doc. 78-2 pp. 3-4].

19

As to the merits, unlike relying on a feeling that the claim would not be successful, MTC refers to a test, the "Seven Tests of Just Cause" as the basis for determining the grievance was not meritorious. [Doc. 74-1 p. 1]. While that test is not included in the record, there is nonetheless evidence that MTC relied on objective measures in determining the merits of Plaintiff's case. Plaintiff offers no contradictory evidence and makes no argument that this basis for declining to pursue arbitration was arbitrary, in bad faith, discriminatory, or perfunctory. Rather, all of Plaintiff's arguments are based on facts that occurred prior to MTC requesting arbitration, which, as discussed above, either were not breaches of its duty or fail to meet the causation requirement set forth in *Webb*. Plaintiff's argument, thus, rests simply on MTC's refusal to take his grievance to arbitration, which is not sufficient to establish a breach of the duty of fair representation. As stated in *Vaca*:

> In administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances. In a case such as this, when Owens supplied the Union with medical evidence supporting his position, the Union might well have breached its duty had it ignored Owens' complaint or had it processed the grievance in a perfunctory manner. But here the Union processed the grievance into the fourth step, attempted to gather sufficient evidence to prove Owens' case, attempted to secure for Owens less vigorous work at the plant, and joined in the employer's efforts to have Owens rehabilitated. Only when these efforts all proved unsuccessful did the Union conclude both that arbitration would be fruitless and that the grievance should be dismissed. There was no evidence that any Union officer was personally hostile to Owens or that the Union acted at any time other than in good faith. Having concluded that the individual employee has no absolute right to have his grievance arbitrated under the collective bargaining agreement at issue, and that a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious, we must conclude that that duty was not breached here.

*Vaca*, 386 U.S. at 194-95 (internal citations and footnote omitted)*; see also Barrentine*, 450 U.S. at 742 ("[E]ven if the employee's claim were meritorious, his union might, without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigorously

in arbitration."). Defendants have produced evidence that MTC's decision not to arbitrate Plaintiff's grievance was made in good faith, and Plaintiff has offered no contradictory evidence. Thus, this case is closer to the facts in *Vaca* than in *Lampkin*, and summary judgment is appropriate.

In sum, this Court agrees with Plaintiff that he has established some violations of the duty to fairly represent him, however, he has failed to establish a genuine issue of material fact that those errors seriously undermined the grievance process or contributed to an erroneous outcome of the grievance process, and thus Plaintiff has failed to establish an essential element of his hybrid claim.[4]

### D.  Element 3: Breach of the Collective Bargaining Agreement

As stated above, in addition to establishing a breach of the duty of fair representation by the

_____

[4]Based on this Court's determination that Plaintiff has failed to produce evidence creating a genuine issue of material fact on the elements of breach of the duty of causation, the Court does not reach MTC's argument that its offer to assign Plaintiff its arbitration rights, and Plaintiff's refusal of that offer, defeats Plaintiff's claim that MTC breached its duty to fairly represent Plaintiff. [Doc. 74, p. 1].   However, this Court notes that at least three courts have rejected arguments that a union can assign its arbitration rights.  *See, e.g.*, *Martin v. City of O'Fallon*, 670 N.E.2d 1238, 1241 (Ill. App. Ct. 1996) ("[T]he personal nature of the roles of each party under the collective bargaining agreement prevents either party from assigning to a third party its right to demand arbitration."); *Dillman v. Town of Hooksett*, 898 A.2d 505, 509 (N.H. 2006) ("Permitting a union to unilaterally assign its right to demand arbitration under a collective bargaining agreement to an individual employee in exchange for a discharge from its duty of fair representation would, potentially, subject a public employer to a deluge of grievances and arbitration demands of variable, and perhaps negligible, merit."); *Padovano v. Borough of E. Newark*, 747 A.2d 303, 308 (N.J. Super. Ct. App. Div. 2000) ("[T]o permit such an assignment could increase materially the burden on the employer by creating the potential for a significantly greater number of matters to proceed to arbitration than otherwise might." (internal quotation marks omitted)); *also compare* Ann C. Hodges, *Fallout from 14 Penn Plaza v. Pyett: Fractured Arbitration Systems in the Unionized Workplace*, 2010 J. Disp. Resol. 19, 39 (2010) (pointing out that "[t]he drive to avoid duty of fair representation claims may influence unions to choose another option: allowing employees to arbitrate their statutory claims under the contractually negotiated grievance procedure" and raising several considerations and questions with regard to such an option, including "[d]oes the duty of fair representation limit the union's ability to assign arbitration rights to employees?") *with* Mitchell H. Rubinstein, *Assignment of Labor Arbitration*, 81 St. John's L. Rev. 41 (2007) (arguing in favor of a limited right of a union to assign arbitration rights to its members and positing policy reasons therefore).

union and that the breach seriously undermined the grievance process, Plaintiff must establish the employer's violation of the CBA. *See Webb*, 155 F.3d at 1239. Plaintiff alleged that Sandia "wrongfully terminated [Plaintiff] in circumstances where [Sandia's] breaches and violations of the CBA, DOT regulatory requirements, and policies and procedures were egregious and without reason. By way of example only and not a comprehensive listing, [Sandia] refused to abide by its drug testing procedures, applied the procedures in a disparate manner to harm [Plaintiff]." [Doc. 1 ¶ 33].

However, in his Response to Sandia's Motion for Summary Judgment, Plaintiff does not cite a specific provision of the CBA that Plaintiff alleges Sandia violated. [Doc. 72]. Further, neither Sandia nor MTC have produced such a provision. Instead, Plaintiff makes three basic arguments as to why he should not have been terminated. First, he argues that "nothing in Defendant [Sandia's] policies and procedures related to drug-testing mandate that an employee who has a positive drug test will be terminated." [Doc. 72, ¶ 1]. Next, he argues that "[a]ny [Sandia] employee who fails to show up for a drug test after being notified of a scheduled test is considered to have tested positive," citing Defendant Sandia's drug policy. [Doc. 72, ¶ 2]. The bulk of Plaintiff's argument, however, is his third argument that Sandia violated several provisions within 49 C.F.R. § 40, the DOT's "Procedures for Transportation Workplace Drug and Alcohol Testing Programs" in performing Plaintiff's drug testing; that these violations "compromised the integrity of the testing process;" and that he has, therefore, created a genuine issue of material fact as to whether Sandia "had true cause to terminated the employment of [Plaintiff] on the basis of a positive drug test." [Doc. 72, pp. 9-12, esp. 11 and 12].

Plaintiff is, in essence, arguing that Sandia lacked just cause to terminate him. None of the parties have produced a CBA provision providing that covered members cannot be terminated

without just cause.  However, the parties appear to agree that "the Side agreement specifically subjected MTC-represented employees to Sandia's drug programs and testing.  Sandia's drug programs and testing included the provisions of Sandia's [Drug Policy], CPR 300.5.3." [Doc. 67, p. 10 (internal quotation marks and citations omitted); Doc. 72, p. 2-3, ¶¶ 1-4]].  Sandia further argues that "Under CPR 300.5.3, Sandia had the right to terminate an employee for a confirmed positive drug test." [Doc. 67, p. 10].   However, Plaintiff argues that other employees who failed to provide a specimen were not terminated.  [Doc. 67-1 p. 9; Doc. 72 p. 2 ¶¶ 1-4].  Thus, both parties appear to believe that, if Sandia had cause under the drug policy to terminate Plaintiff, then Defendant Sandia did not violate the CBA.  This Court will analyze the question of whether there is sufficient evidence to find a breach of the CBA accordingly.

Not all rules governing the interpretation of contracts govern the interpretation of collective-bargaining agreements.

> A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts, which control such private contracts. It is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant. In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.

*Transp.-Commc'n Emp. Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 160-61 (1967) (internal quotation marks, citations and alterations omitted).  The intent of the parties controls.  *See Mack Trucks, Inc. v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*, 856 F.2d 579, 591 (3rd Cir. 1988) ("In order to reach a labor agreement, the parties must establish a meeting of the minds and demonstrate that the parties agreed on the substantive terms and conditions of the contract." (internal citations omitted)), *cited with approval in In re Dittmar*, 618 F.3d 1199,

1206 (10th Cir. 2010).  "[C]ollective-bargaining agreements may include implied, as well as express, terms.  Furthermore, it is well established that the parties' practice, usage and custom is of significance in interpreting their agreement."  *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n,* 491 U.S. 299, 311 (1989) (internal citations omitted); *see also Webb,* 155 F.3d at 1243-44 ("It is well-established that when interpreting the terms of a labor contract, a fact-finder is entitled-and indeed, in some cases required-to look to the past practices of the parties and the common law of the shop to determine the parties' contractual obligations." (internal quotation marks and citations omitted)).

The Side Agreement does not cite a specific policy, but states that Sandia's "programs and testing for substance abuse become effective on October 1, 2009." [Doc. 67-1 p. 8].  The Drug Policy Sandia relies on states, in relevant part:

> It is [Sandia's] policy to strive to maintain a safe and healthy workforce that is free from illegal drug use and the abuse of alcohol or legal drugs, while complying with applicable federal, state, and corporate policy and regulations.
>
> Sandia National Laboratories prohibits possession, use, . . . or being under the influence of illegal drugs[.]
> . . .
>
> **Removing Personnel from Department of Transportation (DOT) Safety-Sensitive Position and Department of Energy (DOE) Testing Designated Positions (TDP)**
>
> The immediate consequences of a confirmed, positive drug test include the worker's badge being confiscated, clearance inactivated and the person being removed from his or her TDP duties.  Other disciplinary actions would follow; they can include termination.  Failure to report to an approved collection center the day of being verbally notified, or refusal to provide a specimen, will result in measures equal to those for a positive drug test.
> . . .
>
> **New Department of Energy Testing Designated Positions**
>
> Contractors must negotiate with employee representatives, as appropriate under labor

relations laws or negotiated agreements, when establishing drug testing programs. SNL must implement without further negotiation all rule requirements one year after the commencement of contract negotiations.  Consequences of a positive result will be bargained with each unit.

[Doc. 67-1, p. 9].  Plaintiff attaches a different policy, entitled "FMCSR Controlled Substance & Alcohol Policy Statement: For Compliance with 49 CFR, Part 382 Sandia National Laboratories."

[Doc. 72-3, pp. 1-4].  This policy states, in relevant part:

> Failure to cooperate with any aspect of this Statement, including but not limited to . . . refusing to cooperate in testing . . . will subject the employee to disciplinary action, up to and including, immediate removal from all safety-sensitive functions, and possible discharge.  Any covered driver who refuses to take a drug or alcohol test to comply with FMCSR regulations (49 CFR, Parts 40 and 382) will be immediately removed from duty as required by these federal regulations until he/she completes the Substance Abuse Professional evaluation, referral and education/treatment process set forth in 49 CFR Part 40, subpart O.
> . . .
> Any covered driver who refuses to take a drug or alcohol test to comply with FHWA regulations (49 CFR Part 382) will be immediately removed from duty as required by these federal regulations.
> . . .
> Any covered driver found to be in violation of this policy statement will be subject to prompt disciplinary action, up to and including termination of employment. Violations include:
>  . . .
> c) A verified positive drug test result.
> d) Refusal to test or to cooperate.

[Doc. 72-3, pp. 2-4].

Plaintiff is correct that this policy does not mandate that Plaintiff be terminated for a positive drug test.  Both policies appear to give discretion to Sandia to discipline employees who test positive, and that discretion expressly includes discipline up to, and including, termination.  The policies themselves do not create a genuine issue of material fact that Sandia breached the CBA by terminating Plaintiff.

Plaintiff has presented evidence that between two and five other employees who failed to

25

report for a drug test after being ordered to take the test were not terminated. [Doc. 72-4, p. 1; Doc. 72-5 p. 6 (Depo. p. 36:4-10)]. But an employee who does not show up for a drug test is not similarly situated to an employee who tests positive for drugs. Sandia's Employee Labor and Relations Specialist testified that "two of them [employees who failed to report for their drug test] were given written reprimands and one was pending." [Doc. 72-5 p. 6 (Depo. p. 36:4-10)]. But he further testified that employees who fail to report for a drug test are "treated as if . . . they have a positive drug test, but they are not similarly situated" to those who test positive, "because there are people that, for whatever – for a number of different reasons may not appear for their drug test either timely or within the same day. . . . If they fail to report, we would want to know why." [Doc. 72-5 p. 6 (Depo. p. 33:20 to 34:10)]. Plaintiff does not provide evidence of the details of the situations in which the employees who failed to show up for drug tests were only reprimanded instead of terminated. For example, he does not provide evidence regarding why they did not show up, or whether or when the reprimanded employees were ever tested for drug use. Sandia may have taken the same steps in disciplining its employees who failed to show up for a drug test but stopped short of termination in those situations in which the employee gave a good reason for missing the test and did not later test positive for drugs. Thus, it is undisputed that, while Sandia's policies require it to treat employees who do not timely appear for their drug test using the same disciplinary *policy* and measures as employees who fail a drug test, that policy does not mandate the same *result* for every employee and gives Sandia discretion to ultimately terminate the employee. Contrary to Plaintiff's assertion, employees who fail to show up for a drug test after being notified of a scheduled test are not "considered to have tested positive" Doc. 72, ¶ 2; they are simply subject to disciplinary-policy "measures equal to those for a positive drug test." Doc. 67-1, p. 9. The Court concludes that evidence of dissimilar treatment of two employees who are not similarly situated does not create a

genuine issue of material fact as to a breach of the CBA.

This Court recognizes that "a clear public policy exists against performing safety sensitive jobs while impaired by drugs or alcohol." *Kennecott Utah Copper Corp. v. Becker,* 195 F.3d 1201, 1205 (1999). This public policy is specifically expressed in both the regulations governing Sandia and Sandia's Drug Policy. *See* Workplace Substance Abuse Programs at DOE Sites, 40 C.F.R. § 707; Procedures for Transportation Workplace Drug and Alcohol Testing, 49 C.F.R. § 40 [Doc. 67-1 p. 9; 72-3 pp. 1-4]. That same policy is expressed within both Sandia's policy and the regulations with regard to individuals who do not report to a drug test within the time period required. [Doc. 67-1 p. 9; 72-3 pp. 1-4]. Sandia's drug policy certainly permits Sandia to draw a negative inference from the failure to report for a drug test and permits Sandia to terminate such an employee, but it does not mandate termination. Moreover, the public policy against performing safety sensitive jobs is not the controlling question in this case. The question here is whether Plaintiff has presented a genuine issue of material fact that Defendant Sandia violated the CBA by terminating Plaintiff solely in light of some evidence that Sandia did not terminate other individuals who were *not* similarly situated, but who *could have been terminated* if their reason for not showing up for the drug test was not satisfactory. Again, Plaintiff has not presented a genuine issue of material fact as to whether Sandia violated the CBA by terminating him.

Sandia cites various cases for the proposition that it could not have breached the CBA if it terminated Plaintiff based on a reasonable belief that Plaintiff failed a drug test. *See, e.g., Anderson v. Exxon Coal U.S.A., Inc.*, No. 96-8032, 1997 WL 157378, *7 (10th Cir. Apr. 4, 1997) (unpublished) (reversing jury verdict in favor of Plaintiff because the employer could not breach an implied contract of employment by terminating the Plaintiff where the drug policy stated that a positive drug test is grounds for termination); *Mollo v. Passaic Valley Sewerage Comm'rs*, Civ. No.

27

07–1655 (DRD), 2009 WL 5216976, *16 (D.N.J. Dec. 30, 2009) (unpublished decision) (rejecting employee's claim that public employer's random drug test breached employment contract because the contract provided for random drug testing and termination of employees who tested positive), *aff'd* 406 Fed. App'x 664 (3d Cir. Jan. 20, 2011) (unpublished); *Lowrey v. Exxon Corp.*, 812 F. Supp. 644, 648 (M.D. La. 1993) (granting summary judgment in hybrid action where language of CBA allowed for termination based on positive drug test and union declined to arbitrate), *aff'd* 19 F.3d 15 (5th Cir. Mar 10, 1994) (unpublished); *Eads v. Cinergy Corp*, No. 1:04-cv-444, 2006 WL 2850512, *5-*6 (S.D. Ohio Sept. 29, 2006) (unpublished decision) (holding that, where "Plaintiff tested positive for cocaine and marijuana in violation federal regulations and CG & E policy" and Plaintiff showed no evidence of discrimination or other breach of CBA, employee failed to present a genuine issue of material fact as to breach of the CBA and he could not prevail on his hybrid § 301 action); *Verrilli v. Sikorsky Aircraft Corp.,* No. 3:03 CV 0541 WWE. 2005 WL 2491572. *4-*5 (D. Conn. Oct. 7, 2005) (unpublished decision) (accord), *aff'd* 221 Fed. App'x 8 (2d Cir. Jan 25, 2007) (unpublished).   These cases are persuasive.

**CONCLUSION**

Plaintiff has not established a genuine issue of material fact as to whether Sandia violated the CBA, and he also failed to establish a genuine issue of material fact that a breach of the duty of fair representation seriously undermined the grievance process.  Thus, summary judgment for each Defendant is granted.

**IT IS THEREFORE HEREBY ORDERED** that Sandia's Motion for Summary Judgment [Doc. 66] is **GRANTED.**

**IT IS FURTHER HEREBY ORDERED** that MTC's Motion for Summary Judgment [Doc. 73] is **GRANTED.**

**IT IS FURTHER ORDERED** that the claims against Sandia Corporation and the claims

against Metal Trade Council are **DISMISSED WITH PREJUDICE.**

UNITED STATES DISTRICT JUDGE